J-S42016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| BRYANT KIMBALL YEAPLES | |
| Appellant | No. 1172 WDA 2015 |

Appeal from the Judgment of Sentence February 24, 2015
In the Court of Common Pleas of Armstrong County
Criminal Division at No(s): CP-03-CR-0000790-2013

BEFORE: SHOGAN, J., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED OCTOBER 19, 2016**

Bryant Kimball Yeaples appeals from the judgment of sentence imposed on February 24, 2015, in the Court of Common Pleas of Armstrong County, made final by the denial of post-sentence motions on March 31, 2015. On December 11, 2014, a jury convicted Yeaples of aggravated assault.[1] The court sentenced Yeaples to a term of 90 to 180 months' imprisonment. On appeal, Yeaples raises evidentiary, sufficiency, and weight claims. For the reasons below, we affirm Yeaples' judgment of sentence.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2702(a)(1).

Yeaples' conviction stems from events that took place in October of 2013. The facts, as recounted during his December 2014 trial,[2] are as follows. Heather Barden testified that in October of 2013, she was living with Yeaples, her boyfriend at the time, and her three young children as well as Yeaples' friend, Edward Barger, and Barger's mother, Deborah K. Lemley.[3] Yeaples is the biological father of two of the minor children but not the youngest, Mykala Yeaples ("Victim" or "the victim"), who was 23 months old at the time.[4] Barden worked at a local grocery store during the day while Yeaples, unemployed at the time, took care of the three children at home.

On Sunday, October 20, 2013, Yeaples texted Barden while she was at work and said that Victim had attempted to eat cigarette butts and he "had to put his fingers in her throat and just get them out and she finally coughed up like all the cotton things." N.T., 12/10/2014-12/11/2014, at 13. Barden stated that when she arrived home, the child's face was bruised from her eyebrows to her chin, and her eyes were "pouffy." *Id.* at 13, 18.

_____

[2] Yeaples originally pled guilty but prior to sentencing, he filed a motion to withdraw his plea which was granted on September 23, 2014.

[3] Lemley owned the home where everyone lived. It was located in Kittanning Borough, Pennsylvania.

[4] Nevertheless, Yeaples was listed as the victim's father on her birth certificate.

The following Thursday, October 24, 2013, when Barden arrived home after finishing a work shift, [Yeaples told her that he was bathing all three children in the bathtub. After returning from getting soap in another room, he saw their son[5] sitting on Victim's head which was under water. *Id.* at 16. Yeaples told Barden he had to do cardiopulmonary resuscitation ("CPR") until Victim finally coughed up water and was fine. *Id.* at 17. When Barden went to check on Victim, she noticed, "[Victim] was asleep, but there was just a small like water mark on her pillow, but she always drooled, so I didn't see anything wrong with it." *Id.* Barden noted Victim did not have any marks on her besides the discoloration on her face from the cigarette butt incident. Neither Barden nor Yeaples took Victim to the hospital to receive attention following this incident.

Barden testified the next evening, she came home from work and found Victim asleep, Yeaples playing a video game, and the other two children watching their father. She stated Victim had a blanket covering most of her face. *Id.* at 21-22. Barden indicated Victim "woke up just a couple times [during the night,] made a couple noises, like moaning noises, found her binky and went right back to sleep." *Id.* at 23.

Subsequently, the following morning, October 26, 2014, Barden stated the family woke up around 9:30 a.m. She explained the children were

---

[5] At the time of trial, the son was four years old.

playing while she made them breakfast and Yeaples was having a cigarette. She said the following incident then took place:

> I don't remember what [Victim] did, but she made [Yeaples] mad somehow and he went to put her in the corner and stood her up and she fell down …. He stood her back up in the corner and she fell down again, like just slowly. She just like laid down. And then I said, is something wrong with her? And he just said, no, she's fine. [He s]tood her back up in the corner and she just laid down again.
>
> I said, maybe she is not feeling well or something. I said, I will sit with her and have her in my lap. If you want her in a timeout, I will put her in my lap. I put her in my lap and he's like, she needs to learn how to stand up. And I said, no, she can just sit here. And then I don't know how I made him even madder. He said, you know, you can get your daughter and get out, and I just stood up and I picked her up and I grabbed my hoodie and keys and said okay and I walked out the door. He followed me out the door.

*Id.* at 25-26.[6] Victim was only wearing a diaper at the time. Barden placed her in the car seat and covered her with the hoodie. Barden waited until Yeaples went back into the home to check on the other children before she left.

Barden testified she then drove to the home of her ex-boyfriend, Henry Toy, to ask for his assistance,[7] and then they both went to her

_____

[6] Barden also testified Yeaples put Victim in her lap after the third attempt at making her stand in the corner. *Id.* at 27.

[7] Barden stated she wanted Toy's protection for when she went back to the house to get her other two children. *Id.* at 66. She said, "[Yeaples] has told me previously if he got the chance to take my children and leave, he would and I would never see them again." *Id.* at 67.

- 4 -

mother's house. After they transferred Victim to the mother's car, they went to the Armstrong County Memorial Hospital. *Id.* at 34. Due to Victim's injuries, she was LifeFlighted to Children's Hospital of Pittsburgh ("Children's Hospital").

On cross-examination, Barden testified she did not see any bruises or lacerations on Victim's body besides the bruising on the face. *Id.* at 49, 77-79.[8] Nevertheless, Barden indicated that on the morning of October 26th, she noticed the back, left side of Victim's head was swollen. *Id.* at 53, 85.[9]

Toy also testified at trial. He stated that when Barden arrived at his home, he noticed Victim's whole face was swollen and black-and-blue, and there were bruises all over her body. *Id.* at 92-93, 100-101. He told Barden that she needed to take Victim to the hospital. Toy said he sat with Victim on the way to the hospital and he tried to keep her from falling asleep. *Id.* at 95.

Adelaide Eichman, M.D., a general pediatrician at Children's Hospital in the Child Advocacy Center, testified she was called in as a consultant to

---

[8] Counsel for Yeaples showed Barden several pictures of Victim's injuries, taken at Children's Hospital. Barden stated the pictures of the child, with bruises besides those on her face, did not match what Barden observed on the morning of October 26th. *Id.* at 70-79.

[9] Barden testified she was charged with the crime of endangering the welfare ("EWOC") of a child as related to this matter. *Id.* at 89. She stated there was no plea agreement, and no promises had been made to her regarding her testimony. *Id.* at 90.

handle Victim's case on October 26, 2013.[10] She indicated that during the

LifeFlight, Victim received a blood transfusion. *Id.* at 115. After

observation, she described Victim's injuries as follows:

> So [Victim] had bruising to her -- her whole entire head was swollen. She had bruising on her forehead and on both of her cheeks. She had bruising kind of going from head to toe. She had bruising on her chest, on the left side of her chest. She had to be in a cervical collar to protect her collar, so you will see these in the pictures.
>
> On her upper back, she had bruises on her upper back. She had bruises over her flank, so basically on her side. [Victim] had bruises on every extremity, so her arms, both arms, and both legs. This was very striking because I see a lot of children that are very active and are mobile, like she was. She was 23 months at the time and these were in very unusual places to get bruises for children.
>
> Typically, I get worried about abuse when I see bruising on soft areas in the body. So if you have bruising over your shins or one over your forehead, I think okay, that's just being a rough and tumble kid. But it's extremely difficult to get bruising over your abdomen, over your flanks, over your thighs. Those are smushy areas and it takes a lot of force for that to happen. So even without any scans, I had made the diagnosis of physical child abuse on this child.
>
> That being said, she did have intensive abdominal injury and I can go over all of that. So kind of going from head to toe again, fortunately, [Victim]'s brain was okay. She did not have any brain injury. She did have three rib fractures on her right side, her seventh, eighth, and ninth ribs in the back were broken. She also had lacerations and bruising of her internal organs. So her liver, she had a big hematoma. That's basically a bruise.

_____

[10] The doctor spoke with Barden and Victim's biological father, but not Yeaples.

…

> So a laceration is a cut. She had a large cut and bruising to her liver. And again, that does not happen in routine childhood play. If you guys are familiar with kids, that does not happen usually accidentally. She had something called hemoperitoneum. So that's a fancy way of saying that she had so much internal bleeding that it had gone out of her organs and was basically in her abdominal cavity. So she needed a blood transfusion because her blood had seeped out and was in the wrong place.
>
> She had bruising to her kidneys and bruising to her right adrenal gland…. She had contusions to the left kidney, which is in the back, more than the right.
>
> …
>
> Contusion is also a fancy word for a bruise. And then part of her, it's called duodenum, that's part of her small bowel, had a hematoma or contusion or bruise, is the normal way to say it. She had bruising to that. She had a small hematoma or bruise to the top of her stomach inside. And then she had something called a pneumothorax, which is basically because she had all the rib fractures, some air … had gotten out of her lungs and into her chest. So she had bleeding in all the wrong places and air going into the wrong places, because of her massive internal injuries.

*Id.* at 116-118.

Dr. Eichman testified Victim needed a second blood transfusion at the hospital and she would have died if she had not received the transfusions. *Id.* at 118. The doctor also indicated Victim's young siblings were "not strong enough to cause these injuries to her." *Id.* at 119. Moreover, when asked about the cigarette butt and bathtub incidents, Dr. Eichman testified Victim's facial injuries would not have been caused by that type of behavior. Specifically, she stated:

So, for instance, with the cigarette butts, if you have ever choked on anything yourself or seen anybody, your face does not stay purple. So that's a temporary thing because of lack of oxygen. So were this story true, which I don't really believe, but were it true, [Victim] would not continue to have facial purpleness once she got oxygen back to her body. So that did not make sense; neither did, again, if she were without oxygen because she w[as] pinned under water. Once she got oxygen, her face color would turn back to normal. So I expected that those were actually bruises to her and that those stories did not explain why she would have bruises.

*Id.* at 121. Additionally, Dr. Eichman concluded a blow or hit to the face caused those injuries, and all of Victim's injuries were the result of physical child abuse. *Id.* at 122.[11] Moreover, Dr. Eichman said,

So medically I can say that these are acute injuries, meaning that they are new, so this is not something that happened the month or the week before. The internal injuries, when [Victim] had those, she would have had symptoms. She would have had pain. She would not have been able to eat normally and she would not have been acting normally. It would have been very clear that this child had been injured severely. So she had come to our hospital on the 26th. I would say that these injuries had occurred within the past 24 hours.

*Id.* at 131.

Trooper Brian Wolfe, of the Pennsylvania State Police, testified that on October 26, 2013, he was off-duty and subsequently called into work based on the report of a young child with injuries being flown to Children's Hospital. *Id.* at 140. He then interviewed Yeaples. Yeaples relayed the

_____

[11] Dr. Eichman testified Victim's biological father said Yeaples had previously sent threats to Barden and him, threatening to kill Victim. *Id.* at 127. Barden did not tell the doctor this information.

events that took place that morning. He told the trooper that his son and Victim were playing with a medical syringe,[12] and that Barden reprimanded the son but not Victim. *Id.* at 143. Yeaples indicated an argument ensued and he was putting Victim in the corner when she bit his hand. *Id.* He also believed Victim was intentionally falling to the floor. *Id.* at 144. Yeaples told the trooper he did not do anything to Victim. *Id.*

Trooper Wolfe further testified that Yeaples told him about the cigarette butt and bathtub incidents, which the trooper commented "was kind of weird, because it just came out." *Id.* Trooper Wolfe said he knew nothing about the case, including those incidents, prior to interviewing Yeaples, and so therefore, Yeaples volunteered this information. *Id.* at 145. Trooper Wolfe stated that after receiving more information about the case, including Victim's condition, he Mirandized[13] Yeaples.

Later in the interview, Yeaples informed Trooper Wolfe he called 9-1-1 after Barden left to report her for driving an unregistered or uninsured vehicle and that Barden had thrown a toy box at Victim. *Id.* at 149.[14] Yeaples also told the trooper he texted Barden that morning:

_____

[12] The syringe was used to give medication to Yeaples' dog.

[13] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

[14] Corporal Craig Chodkowski testified at Yeaples' trial that he received the 9-1-1 call from Yeaples. He also encountered Yeaples at the hospital. He
*(Footnote Continued Next Page)*

He said he kept texting her but [she] did not respond. He said he texted her that he was going to have to go to the hospital because he was having heart problems. He said he asked her if she could come back to watch the kids so he could go to the hospital. He said she texted back that she was on the way [to] the hospital with [Victim] and [the child] was not moving.

*Id.* at 150. Yeaples was then released.

Trooper Wolfe testified that on November 12, 2013, he conducted a second interview of Yeaples along with Trooper Kapustik, a criminal investigator. Yeaples was again given his *Miranda* warnings. *Id.* at 152. They discussed the cigarette butt and bathtub incidents, and Yeaples acknowledged he was the sole caretaker when those incidents occurred. *Id.* at 153. Trooper Wolfe stated they were "pushing" him a little bit about how the injuries occurred because they had the doctor's report and the pictures. However, Yeaples alleged he did not do anything wrong. The trooper informed Yeaples that he was going to be charged with aggravated assault and other charges, and that Barden was going to be charged with EWOC. *Id.* at 156. Trooper Wolfe left the room while another trooper remained in the room with Yeaples. When Trooper Wolfe returned,

[Yeaples] said he was sorry, that something did happen Friday night, that he slipped on a plate that was on the floor and he fell on top of [Victim].

…

(Footnote Continued) ────────────

testified Yeaples looked "nauseous." N.T., 12/10/2014-12/11/2014, at 178. He directed Yeaples to go over to the police barracks for questioning.

He went on to say that it was his entire body weight [that] fell on top of her; that she was standing there, he fell on top of her and they both went to the ground. Then after that, he put her in bed.

*Id.* at 157-158. Trooper Wolfe then took Yeaples to the Armstrong County Jail. Trooper Wolfe testified that en route to the jail, Yeaples' demeanor changed and he "became a little more angrier once we left the station[.]" *Id.* at 159. Yeaples also told him, "I slapped her upside her head so hard I knocked her down." *Id.* Trooper Wolfe did not question Yeaples further about this comment.[15]

On cross-examination, when asked how he made the determination that Yeaples, and not Barden, had abused Victim, Trooper Wolfe stated: "Mr. Yeaples had been with the child nonstop, really, since the 20th, since the alleged cigarette incident, the alleged drowning incident, and also he was the caretaker on the night of the 25th going into the 26th. [Barden] was never alone with the children." *Id.* at 168.

The Commonwealth then rested its case-in-chief. Defense counsel made an oral motion for judgment of acquittal, which the trial court denied. *Id.* at 183.

_____

[15] Trooper Wolfe also testified that during these interviews, they asked Yeaples if Barden hurt the children and he replied in the negative. *Id.* at 168. The trooper also interviewed Barden who stated that she had never seen Yeaples harm the children. *Id.*

Lemley, the owner of the home where Yeaples and the family lived, then testified for the defense. When asked if she ever observed anyone administer physical punishment to Victim, Lemley stated she heard Barden smack the children to get them to lay down and go to sleep, and the hits were so loud she could hear them through a closed door. *Id.* at 188. She also stated Yeaples took care of Victim and treated her as his own. *Id.* at 190. Additionally, Lemley testified she observed Victim on the morning of October 26th, and Victim did not look like how the hospital pictures depicted her when Barden and Victim were leaving the home.[16] *Id.* at 193. Lemley also stated that the morning Barden and Victim left, Yeaples was concerned about getting the other children ready for the day and just said that "he had to go and do something" when he departed. *Id.* at 195.[17]

_____

[16] Trooper Wolfe testified he interviewed Lemley during the investigation and she did not inform him that she saw Barden and Victim on the morning in question. *Id.* at 246. Trooper Wolfe also stated, "[Lemley] said that she was told by [Yeaples] and [Barden] that the bruising on [Victim]'s face was from her choking on cigarette butts a week prior and the older two kids throwing things at [Victim]'s face. She said she was also told that [Victim]'s brother … was standing on her face." *Id.*

He noted Lemley stopped by police barracks on November 12, 2013, the same day Yeaples was being interviewed, and "she wanted to know what was going on with the case and basically to say that she would never believe that Mr. Yeaples could do something like this." *Id.* at 249.

[17] Barger also testified at the trial and his testimony was substantially similar to his mother's statements. He stated that on October 26th, he heard Barden and Yeaples arguing from his room in the basement. *Id.* at 201. He saw Barden and Victim as they were leaving. Like Lemley, Barger also
*(Footnote Continued Next Page)*

Yeaples then took the witness stand. He described both the bathtub and the cigarette butt incidents. *Id.* at 211-212. He then testified that nothing out of the ordinary happened on the evening of October 25, 2013. Yeaples stated that the following morning, he woke and heard his son screaming and crying, and Barden "was yelling at him, telling him to roll the F over, go the F back to sleep, quit touching stuff." *Id.* at 217. He also noticed Victim was crying so he picked her up and she bit him on the finger. *Id.* at 218. Yeaples said he tried to make her stand in the corner several times but she kept sitting down. *Id.* at 219. He testified Victim was conscious, not in distress, and was sitting down because he thought she did not want to be in timeout. *Id.* Yeaples alleges Barden "got pretty belligerent and told [him], do not discipline [Victim]. She is not [his] child."

_____
*(Footnote Continued)* ―――――――――――――――――

stated Victim did not look like how the hospital pictures depicted her as they were exiting the home. *Id.* at 204.

On cross-examination, when asked if Barger remembered telling Corporal Chodkowski that he did not understand why Barden and Yeaples did not take Victim to the hospital for the bruising, Barger said he could not recall such statements. *Id.* at 205.

Furthermore, Corporal Chodowski testified that he interviewed Barger and Barger said he did not hear Yeaples and Barden arguing on October 26th and he did not see the mother and daughter leave. *Id.* at 251-252.

*Id.* at 220. He then placed Victim in Barden's lap and told her to take the child and leave.[18]

> Yeaples testified Barden did not want to leave at first but then,
>
> she got upset enough that she got up, she walked over to the wall where the box of toys was. It was on top of her purse. She was going to get her purse. She picked up the [cardboard] box of toys and she wasn't paying attention and she threw it behind her and it ended up landing on [Victim] whe[r]ever she was lying on the floor.

*Id.* at 221. Yeaples stated he went over to pick up Victim but Barden moved him out of the way, carried Victim and left the house. Yeaples then followed them outside and said Barden "kind of tossed" Victim into the car seat and did not have anything covering the child. *Id.* at 223. Yeaples testified he texted Barden and told her that he loved her and Victim and he wanted them to come back. *Id.* at 225. He said she replied that she did not want to leave and he made her, and that she was going to the hospital because Victim was unresponsive. He also stated he tried to look for her on Barger's bicycle.

> Yeaples indicated he was interviewed by police on two occasions. He explained that during the second interview,

> they kept asking me the same questions repeatedly and repeatedly. Kept calling me an animal. Told me, if you do not tell us what we want to hear or anything different, you are going

_____

[18] On cross-examination, Yeaples testified, "Whenever I put [Victim] into [Barden's] lap, [Barden] did not bother to reach out and grab her and she let her hit the floor." *Id.* at 241.

- 14 -

to be charged with this and you are going to be put in jail. I told them that while the kids were eating, I had walked into the room with stuff in my hands. Like I said, we have a hardwood floor and no furniture in the room. So I walked in and I slipped on one of the kids' plates. I lost my balance and in the process I knocked my youngest daughter over.

*Id.* at 232. Yeaples claims the incident occurred "probably close to a week before" October 26, 2013. *Id.* at 233.[19] He denied ever physically abusing Victim. *Id.* at 237.[20]

Following deliberations, on December 11, 2014, the jury convicted Yeaples of aggravated assault. The jury also made the determination that the victim was less than 13 years of age at the time of the offense. *See* Verdict, 12/11/2015. On February 24, 2015, the court imposed a term of 90 to 180 months' imprisonment.[21] The following day, Yeaples filed a post-

_____

[19] Trooper Wolfe testified that Yeaples admitted the incident happened on Friday, October 25, 2013. *Id.* at 248. Yeaples also stated could not remember when the bathtub incident occurred. *Id.* at 238.

[20] On cross-examination, it was revealed that he told police he was aware she had "some fingerprint bruises" on her back, legs, and face. *Id.* at 243.

[21] We note on December 16, 2014, the Commonwealth provided notice of its intention to invoke the five-year mandatory minimum sentence for aggravated assault at Yeaples' sentencing. *See* 42 Pa.C.S. § 9718(a)(2). However, neither the February 24, 2015, sentencing hearing, the sentencing order, nor the Guideline Sentencing Form indicates the court imposed a mandatory minimum sentence. Moreover, Yeaples had a prior record score of five and offense gravity score of 11; therefore, his seven and one-half to 15 year sentence was within the standard range. *See* N.T., 2/24/2015, at 12. Accordingly, we need not conduct an *Alleyne v. United States*, 133 S.Ct. 2151 (2013), analysis in our review of the matter.

sentence motion. Argument was heard on June 30, 2015. The trial court denied the motion on July 15, 2015, and this appeal followed.[22]

In his first argument, Yeaples claims there was insufficient evidence to support his conviction for aggravated assault because "the Commonwealth failed to present sufficient evidence that it was [Yeaples] who caused the injuries to the victim, an essential element[.]" **See** Yeaples' Brief at 18. Specifically, he points to the following evidence: (1) Barden testified the Victim did not look like the same child in the hospital pictures as the child she saw on the evening of October 25, 2013, and the morning of October 26, 2013, with respect to the bruising and laceration; (2) when Barden arrived at Toy's house with Victim on the morning of October 26th, Toy testified Victim had bruises all over her body; and (3) Dr. Eichman testified Victim's injuries had to have been inflicted within the 24 hours of arriving at the hospital and Victim would not have been acting normally due to the internal injuries, but Barden testified she noticed nothing was unusual or abnormal with Victim. **Id.** at 18-22. Yeaples concludes, "[I]n reviewing Barden's own testimony, when she left her residence on the morning of October 26, 2013, the child did not have the injuries that Henry Toy observed when Barden arrived at his residence." **Id.** at 22.

_____

[22] On July 31, 2015, the trial court ordered Yeaples to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Yeaples filed a concise statement on August 21, 2015. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on September 2, 2015.

We begin with our well-settled standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Melvin**, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted), *appeal denied*, 112 A.3d 651 (Pa. 2015).

A person is guilty of aggravated assault, in relevant part, if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702(a)(1). It is well accepted that identity is an element of all criminal offenses in Pennsylvania. **Commonwealth v. Brooks**, 7 A.3d 852, 857 (Pa. Super. 2010), *appeal denied*, 21 A.3d 1189 (Pa. 2011). Moreover, "[e]vidence of identification need not be positive and certain to sustain a conviction."

- 17 -

*Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa. Super. 2011) (*en banc*), *appeal denied*, 54 A.3d 348 (Pa. 2012).

Here, the court concisely found: "[T]he testimony of the victim's mother provided enough circumstantial evidence for the jury to conclude that [Yeaples] inflicted the injuries on the child. Although [Yeaples] now contends that such evidence was not credible, we defer credibility determinations to the jury's consideration." Trial Court Opinion, 9/2/2015, at 3.

Viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, we agree with the trial court's determination. The Commonwealth presented sufficient circumstantial evidence that Yeaples was the perpetrator, and he intentionally caused serious bodily injury to Victim. Indeed, Victim sustained bruising all over her body, a laceration to her head, and massive internal injuries that required two blood transfusions. Yeaples was Victim's caretaker and the only adult individual around her during most of the time when Dr. Eichman opined the internal injuries were to have occurred. It also merits mention Yeaples testified he never saw Barden physically hurt Victim.

The multiple stories of how Victim got certain injuries that Yeaples provided to Barden and the police were not consistent with the injuries that Victim had received according to Dr. Eichman's expert testimony. In her expert opinion, Dr. Eichman ruled out Victim's young siblings as the

offenders. Yeaples also provided inconsistent statements regarding when certain events took place, including "the slipping on the plate" incident. **Compare** N.T., 12/10/2014-12/11/2014, at 157-158 **with id.** at 232-234.

Moreover, to the extent Yeaples points to Barden's testimony that she never saw the marks on Victim's body besides the facial bruising, the jury was free to reject this testimony. **See Melvin**, **supra**.[23] Lastly, with regard to his implication that the injuries could have been inflicted during the time period when Barden and Victim left their house and went to Toy's home, we find that this argument goes to the weight of the evidence rather than its sufficiency. We will discuss Yeaples' weight claim below. Based on these considerations, we conclude the Commonwealth provided sufficient evidence to establish Yeaples' identity as the perpetrator of the crime. Accordingly, Yeaples is not entitled to relief on this issue.

Next, Yeaples argues the verdict was against the weight of the evidence.[24] **See** Yeaples' Brief at 22. Specifically, he largely reiterates his sufficiency argument, stating:

> [B]ecause Barden herself testified (which was the only testimony provided to prove [Yeaples] was the perpetrator as opposed to someone else, including Barden), that the child did not have the injuries observed by Henry Toy on the evening of October 25,

---

[23] The jury was also free to reject the testimony of Lemley and Barger that they never saw any injuries on the child.

[24] Yeaples properly preserved his challenge to the weight of the evidence by raising it in a post-sentence motion. **See** Pa.R.Crim.P. 607(A).

- 19 -

2013, or on the morning of October 26, 2013, prior to Barden's arrival at Toy's residence, the verdict is, indeed so contrary to the evidence as to shock one's sense of justice.

*Id.* at 23.

Appellate review of a weight of the evidence claim is well-established:

A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. ***Commonwealth v. Widmer***, 560 Pa. 308, 318–20, 744 A.2d 745, 751–52 (2000); ***Commonwealth v. Champney***, 574 Pa. 435, 443–44, 832 A.2d 403, 408–09 (2003). On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination. ***Widmer***, 560 Pa. at 321–22, 744 A.2d at 753; ***Champney***, 574 Pa. at 444, 832 A.2d at 408.

***Commonwealth v. Lyons***, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014).

Here, the trial court found the evidence "weighty enough to sustain the conviction." Trial Court Opinion, 9/2/2015, at 3. We again agree with the court's conclusion. Yeaples fails to explain in what manner the trial court abused its discretion in denying his weight claim. Rather, his argument consists largely of allegations that the greater weight of evidence fell in his favor. As such, he asks this Court to reweigh the evidence; however, we decline to do so. As our Supreme Court has made clear, we may not reweigh the evidence and substitute our judgment for the trial court's decision. ***See Lyons***, *supra*. Therefore, Yeaples' weight claim fails.

Lastly, Yeaples argues the trial court erred in denying his motions *in limine* with respect to prior bad acts and inflammatory photographs. **See** Yeaples' Brief at 24.

> "When reviewing the denial of a motion *in limine*, this Court applies an evidentiary abuse of discretion standard of review. . . . It is well-established that the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." **Rivera**, 983 A.2d at 1228 (citation and quotation marks omitted). Thus, the Superior Court may reverse an evidentiary ruling only upon a showing that the trial court abused that discretion. **Commonwealth v. Laird**, 605 Pa. 137, 988 A.2d 618, 636 (Pa. 2010). A determination that a trial court abused its discretion in making an evidentiary ruling "may not be made 'merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.'" **Id**. (quoting **Commonwealth v. Sherwood**, 603 Pa. 92, 982 A.2d 483, 495 (Pa. 2009)). Further, discretion is abused when the law is either overridden or misapplied. **Commonwealth v. Randolph**, 582 Pa. 576, 873 A.2d 1277, 1281 (Pa. 2005).

**Commonwealth v. Hoover**, 107 A.3d 723, 729 (Pa. 2014).

With respect to the prior bad acts evidence, Yeaples asserts that in Dr. Eichman's report, she opines Yeaples' "'stories about [Victim's] choking on cigarette butts and being held under the water DO NOT explain her injures.'" **Id.** at 25 (capitalization in original; emphasis removed). Yeaples complains:

> [T]here was no *need* to introduce evidence of the prior incidents at issue because the Report states that they *did not cause* the injuries to the victim for which [Yeaples] was on trial. Moreover, the prior incidents were clearly prejudicial to [Yeaples] as they were likely viewed by the jury as tending to show that [he] was the person who injured the victim. Thus, the probative value of (*need for*) the prior incidents involving the cigarette butts and the bathtub, were greatly outweighed by their potential

prejudicial effect and, as such, their admission as evidence at trial constitutes reversible error.

*Id.* (italics in original).

We are guided by the following:

Evidence of prior bad acts is generally inadmissible to prove character or to show conduct in conformity with that character. Pa.R.E. 404(a)(1). Such evidence is, however, admissible when offered to prove other relevant facts, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or *res geste* to give context to events surrounding a crime. [Pa.R.E. 404(b)(2)] While evidence of prior bad acts may be relevant and admissible, due to the potential for misunderstanding, cautionary instructions are sometimes required.

*Commonwealth v. Reid*, 99 A.3d 427, 451 (Pa. 2014) (some citations omitted).

In denying Yeaples' motion *in limine*, the trial court found the following:

If the Commonwealth introduces [Yeaples'] statements to prove that the other wrongful acts actually occurred, the statements would be probative of [Yeaples'] attitude towards and relationship with [Victim] … as well. The incidents, which involve [Yeaples] repeatedly allowing the child to become physically injured without seeking medical attention, tend to show that [Yeaples] did not much care about the victim, possibly because she is not his biological child. [Yeaples'] possible dislike for the victim is also probative of a motive to assault her. Lastly, because the examining physician is expected to testify that those prior incidents could not have caused the injuries that the child manifested at Children's Hospital days later, [Yeaples'] linking of the prior incidents with the child's manifested injuries is probative of possible consciousness of guilt and [Yeaples'] need to conceal his aggravated assault of the victim.

The Court also finds that the probative value of the above evidence outweighs its potential for unfair prejudice. The

- 22 -

incidents suggest that [Yeaples] did not take good care of the victim. However, it is important for the jury to hear [Yeaples'] explanations of what happened and how the victim's injuries allegedly occurred so that they can assess how the situations bear on [Yeaples'] attitude toward the victim and [his] possible motive to cause the child harm.

On the other hand, if the statements that [Yeaples] made to the state police are offered to prove that he said something probative of guilt, they are admissible, as well. They tend to show (1) that the victim was in his custody and care; (2) that he knew the victim's injuries were serious; and (3) that he felt obligated to offer a fairly innocuous explanation for them because he was conscious of his own guilt and needed to conceal the fact that he had deliberately caused the victim's injuries. The fact that [Yeaples'] explanations of how the victim's injuries occurred may seem rather far-fetched to a fact finder may demonstrated a desperate effort to conceal [Yeaples'] true role in her injuries.

Trial Court Opinion, 12/9/2014, at 3-4.

We agree with the trial court's well-reasoned analysis. While Yeaples may be correct that the prior bad acts evidence did not establish what caused Victim's injuries, the evidence did demonstrate the relationship between Yeaples and Victm as well as the potential motive and consciousness of guilt for Yeaples' actions. Likewise, his statements regarding these incidents were probative of his guilt. Furthermore, the probative value of this prior bad acts evidence also outweighed the risk of unfair prejudice. The Commonwealth was entitled to show the complete history of the case. Therefore, we conclude the trial court did not abuse its discretion in denying Yeaples' motion in limine on this prior bad acts evidence.

With regard to the photographs, Yeaples notes that at trial, 13 photographs depicting Victim's injuries were introduced for the purpose of demonstrating whether Yeaples exhibited an extreme indifference to the value of human life. *Id.* Yeaples claims:

[The court] ignores the fact that [Yeaples] stipulated that the victim's injuries were such that whoever inflicted them did so with an extreme indifference to the value of human life. Thus, the photographs were clearly not needed for the purpose enunciated by the [trial] court in its ruling permitting their permission [sic]. Because there was no need for the photographs, they had no probative value whatsoever and, therefore, their inflammatory nature and resulting prejudicial effect rendered them clearly inadmissible.

Yeaples' Brief at 26 (citations omitted).

Keeping the above-stated standard of review in mind, we are also guided by the following: "The admission of photographs is a matter resting with the discretion of the trial court." *Commonwealth v. Tharp*, 830 A.2d 519, 530 (Pa. 2003), *cert. denied*, 541 U.S. 1045 (2004). In *Commonwealth v. Malloy*, 856 A.2d 767 (Pa. 2004), the Pennsylvania Supreme Court set forth a two-part test for the admissibility of photographs.

First, the court must decide whether a photograph is inflammatory by its very nature. If the photograph is deemed inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury.

*Id.* at 776. Additionally, "the fact that a medical examiner can describe the victim's wounds to the jury does not render photographs of those wounds irrelevant." *Commonwealth v. Haney*, 131 A.3d 24, 38 (Pa. 2015)

- 24 -

(quotations and citation omitted). To be considered inflammatory, a photograph "must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective assessment of the guilt or innocence of the defendant." ***Commonwealth v. Dotter***, 589 A.2d 726, 729 (Pa. Super. 1991) (citation and quotation omitted), *appeal denied*, 607 A.2d 249 (Pa. 1992).

Here, the photographs at issue depicted the bruising on multiple parts of Victim's body, including her face, as well as the laceration on her skull. ***See*** Commonwealth's Exhibits 1-13. In denying Yeaples' motion *in limine*, the trial court determined:

> The question is whether the 13 photographs' probative value is outweighed by a danger of unfair prejudice or needlessly presenting cumulative evidence. [Yeaples] contends that the photographs are not needed to prove aggravated assault because the examining physician from Children's Hospital will provide graphic testimony about the child's various injuries at trial. [Yeaples] also contends that the child's injuries themselves support a finding of extreme indifference to human life; therefore, the photographs are not needed to demonstrate extreme indifference to human life.
>
> However, the Court believes that the photographs are probative to the issue of whether [Yeaples] exhibited an extreme indifference to the value of human life. A visual depiction of the child's visible injuries is not the same as a physicians' verbal description of the child's injuries. As such, the evidence is not needlessly cumulative. The Court finds that the probative value of the photographs is not outweighed by the danger of unfair prejudice.

Trial Court Opinion, 12/9/2014, at 2-3 (footnote omitted).

In reviewing the 13 photographs, we cannot conclude the trial court abused its discretion in determining that the photographs were not inflammatory. The photographs were taken in a hospital setting, and were an accurate depiction of the nature and extent of Victim's physical injuries at the time she was admitted to the hospital. Moreover, as the trial court noted, the visible injuries as shown in the photographs were not the only injuries Dr. Eichman discussed during her testimony, which included the extensive internal injuries Victim suffered, so the evidence cannot be considered cumulative. Additionally, the photographs contradicted Yeaples' testimony that Victim's injuries were minor and she had "some fingerprint bruises[.]" N.T., 12/10/2014-12/11/2014, at 243.

Furthermore, even accepting, *arguendo*, the argument that the photographs are inflammatory, we would deem this claim meritless since the photographs were highly probative as they related to the issue of whether Yeaples exhibited an extreme indifference to the value of human life. ***See*** 18 Pa.C.S. § 2702(a)(1). We note the record does not establish the parties formally stipulated to the fact that the circumstances regarding the injuries manifested an extreme indifference to the value of human life.[25] Therefore,

_____

[25] At the motions hearing, the following exchange took place:

THE COURT: Are you willing to concede that it is not just serious bodily injury, but under circumstances manifesting extreme indifference to the value of human life? Are you willing to

*(Footnote Continued Next Page)*

we find the trial court did not err in denying Yeaples' motion *in limine*

regarding these photographs. Accordingly, his final argument fails.

*(Footnote Continued)* ───────────────

> concede that whoever inflicted those injuries acted within that framework?
>
> [Defense counsel]: I am, because the doctor will testify and she testified, I believe, at the CYS hearing … that this child was within literally minutes of death and the child -- and I read through the medical reports. The child has lacerated spleen, liver, all of her internal organs, plus the bruising to the face, yeah, it would be. I think if this child --
>
> THE COURT: Have you talked to your client about that?
>
> [Defense counsel]: Yes.
>
> THE COURT: That he would be willing to concede that serious bodily injuries and that whoever did this acted under circumstances manifesting extreme indifference to the value of human life?
>
> [Defense counsel]: Well, I don't really think it matters from my client's standpoint.
>
> THE COURT: No. I asked you if you would be willing to stipulate to that?
>
> [Defense counsel]: I mean, it doesn't make any difference because the injuries, themselves, would support a conviction, whether or not there was -- of aggravated assault.

N.T., 12/8/2014, at 31-32. Furthermore, Yeaples does not point anywhere in the trial notes of testimony where the parties stipulated to this element of the crime.

It also merits mention that at trial, counsel for Yeaples requested the admission of the photographs to impeach Barden. N.T., 12/10/2014-12/11/2014, at 73 ("[Defense counsel]: At this point I think I need to use them, too, to impeach the witness, so I think they can come in.").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/19/2016